United States District Court
Southern District of Texas

**ENTERED**

May 28, 2026

Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| DAVID KING, | § | |
| | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | CIVIL ACTION NO. H-25-1850 |
| | § | |
| UNUM LIFE INSURANCE COMPANY | § | |
| OF AMERICA, | § | |
| | § | |
| Defendant. | § | |
| | § | |

**MEMORANDUM AND OPINION**

This dispute arises out of a claim for benefits under an ERISA plan. David King alleges that he has debilitating syncope, such that he cannot perform his job as an engineer at oil refineries. Climbing and driving are part of the job, but he alleges that he cannot perform those duties because he loses consciousness easily.

Unum Life Insurance Company of America denied King's benefits claim. King now challenges that denial in federal court. The parties have cross-moved for summary judgment. (Docket Entry Nos. 19, 23, 24). Based on the pleadings, the motion, the record, and the applicable law, the court grants Unum's motion for summary judgment and denies King's motion for summary judgment. A final judgment in Unum's favor is entered separately. The reasons for these rulings are set forth below.

I.      **Background**

        A.      **The Policy**

Effective January 1, 2002, Unum Life Insurance Company of America issued a group disability policy to Valero Energy Corporation, where King worked as a Staff Process Engineer.

(Record at 208–56).  The Policy contains a "regular occupation" definition of disability for the first 24 months of payments.

The Policy provides that a beneficiary is someone who "Unum determines" meets two conditions: (1) "you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury"; and (2) "you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury."  (*Id.* at 223).[1]  The Policy defines "regular occupation" as "the occupation you are routinely performing when your disability begins," which is based on "your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location."  (*Id.* at 241).

The Policy contains an 180-day elimination period during which no benefits are payable. (*Id.* at 224, 232).  To prove that the Policy conditions for disability benefits are met, the insured must show, among other things, "that you are under the regular care of a physician," "the cause of your disability," and "the extent of your disability, including restrictions and limitations preventing you from performing your regular occupation."  (*Id.* at 214).

The Policy provides that after 24 months of payments, an insured is "disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience."  (*Id.* at 223).  The Policy defines "gainful occupation" as "an occupation that is or can be expected to provide you with an income within 12 months of your return to work, that exceeds: 80% of your indexed monthly earnings, if you are working; or 60% of your indexed monthly earnings, if you are not working."  (*Id.* at 238).

---

[1] The administrative record is filed at Docket Entry Nos. 18-1, 18-2, and 18-3.

The Policy contains a 24-month benefits limit for disabilities based primarily on self-reported symptoms or due to mental illness.  (*Id.* at 230).  Self-reported symptoms "means the manifestations of your condition which you tell your physician, that are not verifiable using tests, procedures or clinical examinations standardly accepted in the practice of medicine.  Examples of self-reported symptoms include, but are not limited to headaches, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness and loss of energy."  (*Id.* at 242).

B.    **King's Disability and Medical History**

In December 2016, King saw Dr. Michael Raizner at International Cardiology Associates Medical Center.  The doctor diagnosed syncope.  (Record at 995).  King's blood pressure was elevated during the visit.  (*Id.*).  King had recently suffered several near-syncopal episodes, including one that resulted in an emergency-room visit.  (*Id.*).  Dr. Raizner ordered an electrocardiogram and an awake-and-drowsy electroencephalogram, as well as laboratory work.  (*Id.* at 645–57, 995–96).

That same month, Dr. Nadim Nasir, Jr., a cardiac electrophysiologist at Houston Methodist Hospital, performed a head-up tilt table test to assess King's recurrent syncope and presyncope.  (*Id.* at 640–41).  The test was positive for vasovagal syncope.  (*Id.*).  Dr. Nasir recommended that King increase his salt and fluid intake, use Jobst stockings, and discontinue metoprolol.  (*Id.*).  Dr. Nasir sent the findings to Dr. Raizner, with a recommendation that a slightly higher baseline blood pressure be used to try to reduce King's symptoms.  (*Id.*).

In March 2017, King followed up with Dr. Nasir.  (*Id.* at 627–31).  King reported three or four more episodes before Dr. Raizner changed King's Metropolol to Bystolic in February 2017, which decreased his drowsiness and the frequency of his episodes.  (*Id.* at 628).  Dr. Nasir referred King to Dr. Raizner to discuss a loop recorded implant for near syncope.  (*Id.*).

3

King's medical history is unremarkable from 2017 to the Spring of 2023. In April and May 2023, Dr. Raizner ordered that King have a study for a medium-term holter report. (*Id.* at 102–118). The reasons for the study were "[s]yncope and collapse," palpitations, and a family history of heart and circulatory disease. (*Id.* at 102).

Later that month, King consulted via video with Dr. Thomas Williamson to address his increasing anxiety related to claustrophobia. (*See id.* at 134–35). Dr. Williamson assessed King as having essential hypertension with moderate persistent asthma. (*Id.*). King was prescribed Floven and Zoloft for daily use and advised to follow up with in-person visits and medication titration as needed. (*Id.*).

In June and July 2023, King visited Dr. Raizner for another evaluation of his syncope and near-syncope. Dr. Raizner noted the old but positive tilt-table test and assessed King as having syncope and collapse, benign essential hypertension, a family history of cardiovascular disease, palpitations, and hypercholesterolemia. (*Id.* at 83–86). Dr. Raizer ordered laboratory work, an electrocardiogram, a treadmill EKG stress test, and recommended a 30-day mobile telemetry. (*Id.*). King underwent another study that resulted in a holter monitor report, which recorded 80 tachycardia episodes and 496 episodes during the two-week test. (*Id.* at 87–100). On July 27, 2023, Dr. Raizner signed an Attending Physician Statement that diagnosed King as having hypertension, with symptoms first occurring in May 2016; designated a disability date of May 9, 2023; and concluded that King could not perform full-time, non-restricted work. (*Id.* at 128–29).

### C.    King's Long-Term Disability Claim and Unum Life Investigation

King's claim started as a claim for short-term disability under Valero's self-funded plan. King's last day of work for Valero was on May 8, 2023. (*Id.* at 77). On September 1, 2023, Valero sent Unum Life an employer statement that initiated a long-term disability claim for King under

the Policy.  (*Id.* at 76).  Unum Life also received Dr. Raizner's July 2023 Attending Physician Statement and a separate Claimant's Statement.  (*Id.* at 128–30).  King's Claimant Statement identified Dr. Raizner as the treating physician, described symptoms of "collapsing followed by high blood pressure," and anticipated a return-to-work date of October 13, 2023.  (*Id.* at 130).

In October 2023, Unum Life received King's medical records from Dr. Raizner.  The records included only King's office visit in June 2023.  Although the notes referred to King's old positive tilt-table test, the test records were not included in what Unum Life received.  (*Id.* at 307–09).  Unum Life did receive a statement from Dr. Raizner that King "reports syncope, but no lightheadedness"; that King was to go to the emergency room if he experienced worsened dizziness or other symptoms; and that King's hypertension was benign.  (*Id.* at 309).

Soon after, Valero provided King's job description.  (*Id.* at 362–65).  King's job was described as requiring him to provide "technical expertise for a particular area of the refinery to enable the most optimum performance that will meet the company's economic, environmental and safety objectives."   (*Id.* at 364).   King, among other responsibilities, made decisions "independently on engineering problems and methods"; represented "the organization in meetings to resolve important questions and to plan and coordinate work"; assessed "the feasibility and soundness of proposed engineering evaluation tests, products, or equipment when necessary data are insufficient or confirmation by testing is advisable"; "[d]irect[ed] and supervise[d] engineering consultants and contractors on major project process engineering development"; and "[u]se[d] process simulation software to evaluate complex problems and size/rate equipment."  (*Id.*).  The job description did not include physical activities, such as climbing or driving, but did state that King's responsibilities in overseeing projects at refineries included field work when necessary.

On October 19, 2023, Allison Smith, a Senior Disability Specialist with Unum Life, called King. (*Id.* at 378–84). King explained that he had stopped working because he would lose "consciousness." (*Id.* at 378). He stated that he lost consciousness during a tilt-table test "about 7 years ago" and that his syncope had become a daily issue. (*Id.* at 378–79). King conceded that Dr. Raizner had not identified a cause of the syncope. (*Id.*). King also explained that driving and "climbing at work" would likely provoke additional syncopatic episodes. (*Id.* at 379). King explained that he often made field visits for projects to collect data, inspect equipment, and perform other job responsibilities. (*Id.* at 381). King told Smith that he was still active: he walked 20 minutes a day; lifted weights and rode a stationary bike 3 times a week; assisted with household chores and cooking; and drove on a limited basis. (*Id.*).

On October 24, 2023, Lisa Townsend completed a vocational review. (*Id.* at 390–91). Townsend classified King as a "Refinery Process Engineer" who "[d]evelops and optimizes processes in a refinery facility." (*Id.* at 390). She did not notice a difference between Valero's job description and King's activities. (*Id.*). King, among other responsibilities, "[g]athers, reports on, and analyzes operational data to determine the condition of processes"; performs "root cause analyses and recommends technical solutions and improvements"; "[s]tudies effects of variables on production efficiency and proposes measures for enhancement"; and "[a]bides by safety regulations in the operating unit." (*Id.*). She noted that King had to perform "Light Work," including "Lifting, Carrying, Pushing, Pulling up to 20 Lbs. occasionally, up to 10 Lbs. frequently, or negligible amount constantly." (*Id.*). She reported that "[d]riving and climbing are not material and substantial duties of the occupation as performed in the national economy." (*Id.* at 391).

On November 15, 2023, Smith asked Dr. Raizner about King's restrictions and limitations. (*Id.* at 410–11). Dr. Raizner responded on February 29, 2024, with updated medical records. (*Id.*

at 444–67).  These included records of King's follow-up appointments with Dr. Raizner in October and December 2023.  (*Id.* at 459–67).  In the notes for those visits, Dr. Raizner reported that King suffered syncope but experienced no lightheadedness and that he should go to the emergency room if he had worsening symptoms, such as dizziness.  (*Id.* at 462).  Dr. Raizner responded to Smith, explaining that King had restrictions and limitations that would extend beyond October 12, 2023, but Dr. Raizner did not identify how long those restrictions would last.  His explanation merely noted a "history of recurrent syncope/near syncope and hypertension."  (*Id.* at 446–47).

In a March 14, 2024 letter, Dr. Jennifer Driscoll,[2] an in-house medical professional at Unum Life, asked Dr. Raizner about King's restrictions and limitations in light of her preliminary assessment that King's medical issues would not preclude him from working.  She asked the following:

> 1. Upon my initial review of the submitted medical records, it appears that although Mr. King reports recurrent syncopal or pre-syncopal episodes, his risks for having a spell is the same at work as it is outside of work. Despite his risk of a recurrent spell, he has been able to drive, do chores, lift weights, and ride a stationary bike while out of work. Based on Mr. King's reported level of activity, the lack of apparent high-risk occupational demands such as climbing, and the low intensity of ongoing care, it appears Mr. King was not precluded from performing the occupational demands outlined above on a full-time basis beyond the completion date of his last Holter monitor on 7/14/2023. Do you agree?
>
> 2. If you do not agree, please help me better understand Mr. King's work capacity and the work restrictions you have given him by providing any clinical information you think might be helpful and explaining the medical reasoning for work restrictions in the space provided below, or feel free to contact me by phone.

---

[2] On March 12, 2024, Thai Monroe, a registered nurse employed by Unum Life, reviewed King's claims and opined that he could work in his regular occupation, largely on the basis that physically demanding activities such as driving and climbing were not part of King's work.  (Record at 495–97).  Monroe noted that King's "reported symptoms appears to be inconsistent with his reported impairment" because he "reports he does drive but is very limited," "reports he does weight lifting and uses stationary bike 3 times/week," and reports he "is able to help with household chores and cooking."  (*Id.* at 497).  She concluded that the medical information available did not support the conclusion that King lacked capacity to perform light physical activity.  (*Id.*).

(*Id.* at 549–50).  Dr. Raizner did not respond.

Dr. Driscoll concluded that King's claimed restrictions and limitations were not supported by the evidence and his medical file.  She explained that although King claimed that his "recurring syncopal spells preclude him from returning to work, there is no documentation of witnessed syncopal spells, urgent care or emergency department evaluation related to syncope, or injury related to syncope noted in the medical records submitted for review."  (*Id.* at 569).  She added that there was "no documentation in the submitted medical records from Dr. Raizner or from the [King's] primary care physician, internist Thomas Williamson, M.D., describing the triggers, prodrome, duration, and frequency of the Insured's syncopal spells."  (*Id.*).  And she noted that the attention King paid to his medical condition "was inconsistent with the claimed level of disability and does not support that" King "was precluded from performing the outlined occupational demands."  (*Id.*).

On April 1, 2024, Dr. George DiDonna, another medical professional with Unum Life, completed a second-level review of King's medical file and claims.  (*Id.* at 571–73).  DiDonna acknowledged the 2016 tilt-table test in December 2016, the visits with Dr. Raizner, and the other medical reports in King's file.  (*Id.*).  Dr. DiDonna concurred with Dr. Driscoll that "the medical evidence on file does not support" King's "preclusion from the full-time occupational demands." (*Id.* at 573).  Dr. DiDonna reasoned that King was "diagnosed with Vasovagal Syncope in 2016 with an abnormal HUTTT indicative of vasodepressor syncope, a reflex disorder," yet he "worked with this condition from then until taking himself out of work in May of 2023."  (*Id.* at 572). According to the review, King was taking appropriate medications and had not experienced "another documented true syncopal event" in the 11 months since his date of disability.  (*Id.*). King "had presyncope at bedtime at home about two months ago, but no other spells are

8

described"; "does not have limiting intractable spells of loss of consciousness and seems to have a prodrome prior to his 'presyncope'"; and presented with "no evidence of a structural heart disease as a cause of his symptoms." (*Id.*).

On April 2, 2024, Smith informed King that it denied his long-term disability claim. (*Id.* at 580–87).

### D.    The Appeal, Additional Review, and Final Denial

On April 1, 2024, just before Unum Life denied King's claim, King visited Dr. Raizner. (Record at 617–19). King reported to Dr. Raizner that his near-syncope was worsening such that he could not ride in a car and could not stand for a long time. (*Id.* at 618–19). Dr. Raizner logged many of the same diagnoses and issues as were recorded in his earlier reports: syncope and collapse, benign essential hypertension, family history of cardiovascular disease, palpitations, hypercholesterolemia, and coronary atherosclerosis. (*See id.* at 617–19). He ordered laboratory work, an echocardiogram, and mobile telemetry. (*Id.*). He also slightly adjusted King's medications. (*Id.*).

On April 8, 2024, Dr. Raizner submitted to Unum his office visit note, a copy of Dr. Driscoll's previous March 2024 letter, and a copy of the December 2016 tilt-table test results. (*Id.* at 608–21). The added records included King's blood-pressure logs from August 2017 through August 2024. (*Id.* at 739–993). Unum reviewed the additional information provided but, in an August 26, 2024, letter, continued to deny King's long-term disability claim. (*Id.* at 1018–21).

On October 9, 2024, King appealed. (*Id.* at 1068–82). King's counsel sent UNUM a CD with some new information and some information that was already in the administrative record. (*Id.* at 1187–1687). King also submitted statements from himself, his wife, his father, his sister, and his son; a more detailed job description of his position at Valero; and the Return to Work

Certification form that he would need to complete to return to work.  (*Id.* at 1096–1130; 1100–1102).  King described a serious disability and an inability to function in daily life.  He stated that he could not "rid[e] in vehicles as a passenger"; could not spend more than 40% of his day sitting; could not change from a sitting to standing position with frequency; and suffers syncope episodes 2 to 3 times a day, triggered by day-to-day activities such as using stairs, an elevator, and ladders, or by using the computer for extended periods.  (*Id.* at 1097–99).  King's family corroborated his report, explaining that he could not perform daily tasks due to his frequent episodes, triggered by such routine occurrences as eating too much, eating the wrong food, stress, pain, being in crowded spaces, or coughing.  (*Id.* at 1126–30).  King collected more corroborating statements from his son and coworkers and friends.  (*Id.* at 2161–63).[3]

On December 16, 2024, Patricia Bell, an appeals specialist for Unum, referred King's claim for an additional vocational review to consider the new occupational information that King included in his appeal.  (*Id.* at 1177).  Julie Degenhardt completed that review on December 19, 2024.  (*Id.* at 1178–81).  She concluded, consistent with the first review, that King's occupation in the national economy was a Refinery Process Engineer.  (*Id.* at 1180).  She noted that King's duties included "gathering data, working on and assessing technical aspects of these chemical engineering processing and production equipment."  (*Id.*).  "As such," she explained, "climbing would be expected to conduct observation and data gathering assessments on such equipment," and "[o]perating a vehicle to various refinery process and production station locations to" evaluate "equipment for optimum performance would also be expected."  (*Id.*).  She conducted additional

---

[3] On December 4, 2024, King saw Dr. Raizner via telemedicine appointment to follow up on his symptoms. (Record at 2248–50).  Dr. Raizner's notes include similar material to those in the notes from King's previous reports.  King was assessed as having syncope and collapse, disorder of autonomic nervous system, coronary arteriosclerosis, benign essential hypertension, hypercholesterolemia, and a family history of cardiovascular disease.  (*Id.* at 2249–50).  King was referred to a neurologist, was ordered laboratory work, and was directed to monitor his blood pressure at home.  (*Id.* at 2250).

"labor market research of refinery engineering occupations," which "reflect[ed] [that] climbing and driving is performed." (*Id.*). Degenhardt concluded that "climbing and driving would be expected in performing some of the material and substantial duties of a refinery process engineer." (*Id.*).

After Unum Life held a forum session to discuss the appeal and the information that King submitted, (*id.* at 2170–71), Dr. Crystal Bright completed an appellate review of King's claim, (*id.* at 2177–80). Dr. Bright concluded "with a reasonable degree of medical certainty that the available medical file evidence does not support restrictions and limitations precluding the claimant from performing the occupational demands." (*Id.* at 2179). Dr. Bright offered three reasons for her conclusion.

First, King "reported he took himself out of work due to loss of consciousness; however, he also reports years of history of syncope/pre-syncope," including that "he had a tilt table test and lost consciousness and had a hard time recovering." (*Id.*) Yet there was "no evidence of a significant change in the claimant's condition to support loss of functionality at the time the claimant ceased working." (*Id.*).

Second, King's tests did not show substantial limitations: his June 2023 notes reported him "as comfortable" with "a normal strength and tone"; his June-July 2023 "Holter monitor showed sinus bradycardia to sinus tachycardia" but included "no mention of V-tach, SVT, pauses, atrial fib or flutter, or diary events"; his October 2023 "coronary calcium score showed minimal extent of atherosclerosis in the left circumflex artery," which does "not support R/Ls precluding the outlined occupational demands"; his October 2023 notes with Dr. Raizner "noted that the claimant had a normal affect," "was being treated with Sertraline 50mg," and did not mention "requiring

any additional referrals to help manage his stress during the period under review which he associated as a cause of his syncope." (*Id.*).

Third, King's self-reports of syncope events were inconsistent with the rest of his medical file. Although King "reports experiencing syncope or near syncope 2-3 times per day," "there is no evidence of any ER or urgent care visits during the period under review for syncope/pre-syncope or injuries from falls." (*Id.*). Although King "reports he could not walk for more than 30 minutes, unable to stand 10 to 15 minutes at a time without resting, and he is unable to drive," he reported in October 2023 that he was "walking 20 minutes a day, weightlifting, and us[ing] stationary bike three times per week," was able "to help with household chores and cooking," and "drives but limited and not on his own." (*Id.*). "This level of activity, especially the claimant's reports of ability to drive, does not support his reported symptoms are of a severity to preclude the outlined occupational demands." (*Id.*). And although King reported migraines, "there is no evidence of any significant treatment or reports of migraines during the period under review," nor was there "mention of any side effects from any medications or any co-morbidities that would have functionally impaired the claimant from performing his occupational demands." (*Id.*).

King received Degenhardt's vocational review and Dr. Bright's medical review on February 3, 2025. King responded to Unum Life's assessment and provided additional information, including a table of his medical visits and a statement with a line-by-line dispute of Dr. Bright's medical review. (*Id.* at 2219–53). King also submitted notes from a follow-up telemedicine visit with Dr. Raizner on March 31, 2025, describing King's "reported current clinical reported symptoms." (*Id.* at 2269–74). In that visit, Dr. Raizner assessed King as having syncope and collapse, disorder of autonomic nervous system, coronary arteriosclerosis, benign essential hypertension, hypercholesterolemia, family history of cardiovascular disease, and

12

anxiety. (*Id.* at 2273–74). Dr. Raizner requested a follow-up visit in six months. (*Id.* at 2274).

He also recorded that although King had been referred to a neurologist, King had not seen one.

(*Id.*). Dr. Raizner also completed a recommended restrictions form on April 14, 2025, which

explained that absences from work were clinically necessary, that King had limited mobility, and

that he should be precluded climbing ladders, working from heights, and driving or operating

machinery. (*Id.* at 2270–71).

On April 18, 2025, Unum Life denied King's appeal. (*Id.* at 2286–93). The letter surveyed

the evidence described above and concluded that King was "not disabled as defined by the policy

as of May 9, 2023 and continuing" and that "he is not eligible for benefits." (*Id.* at 2290).

This civil action followed five days later on April 23, 2025.

## II.    The Legal Standard

### A.    Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving

party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "The movant bears the

burden of identifying those portions of the record it believes demonstrate the absence of a genuine

issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). If the burden of proof at trial lies with

the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing

out to the district court—that there is an absence of evidence to support the nonmoving party's

case." *Celotex*, 477 U.S. at 325. Although the party moving for summary judgment must

demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements

of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). "A

fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit

13

under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quoting *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir.2000) (per curiam)). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir.2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

### B.   Denial of Benefits Under ERISA

An ERISA beneficiary may bring a civil action in federal court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). A district court

14

reviews the plan administrator's decisions de novo, unless a different standard is provided in the plan documents. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008).

The parties agree that de novo review applies. (Docket Entry No. 19 at 13; Docket Entry No. 23 at 2). "*De novo* review requires that the court apply the same standard as the plan administrator in deciding whether the benefits were owed under the plan's terms." *Ariana M. v. Humana Health Plan of Texas, Inc.*, No. CV H-14-3206, 2018 WL 4384162, at *12 (S.D. Tex. Sept. 14, 2018) (citing *Hightower v. Tex. Hosp. Ass'n*, 65 F.3d 443, 447 (5th Cir. 1995)), *aff'd*, 792 F. App'x 287 (5th Cir. 2019). Courts may not review information that was not before the administrator at the time it made its decision. *Ariana M. v. Humana Health Plan of Texas, Inc.*, 884 F.3d 246, 254 (5th Cir. 2018) (en banc).

"Once the record is finalized, a district court must remain within its bounds in conducting a review of the administrator's findings, even in the face of disputed facts." *Id.* at 256. The administrative record "consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it." *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 300 (5th Cir. 1999) (en banc), *overruled on other grounds by Glenn*, 554 U.S. 105. The plan administrator must "identify evidence in the administrative record" and provide "claimants a chance to contest whether that record is complete." *Ariana M.*, 884 F.3d at 256. A claimant introduces evidence into the administrative record "by submitting it to the administrator in a manner that gives the administrator a fair opportunity to consider it." *Vega*, 188 F.3d at 300.

A district court may admit documents outside the administrative record only to help "evaluate the administrative record." *Ariana M.*, 885 F.3d at 256. The court may admit documents showing how the administrator interpreted the plan terms in the past or what unclear medical

15

terminology means. *Vega*, 188 F.3d at 299. The district court cannot consider documents or information outside the administrative record if they bear on "disputed material facts—i.e., a fact the administrator relied on to resolve the merits of the claim itself." *Id.*

### III.    Analysis

The question is whether King was "limited from performing the material and substantial duties of [his] regular occupation due to [his] sickness or injury"—in this case, syncope. (Record at 223). The evidence does not support King's claim by a preponderance of the evidence, for three reasons.

First, King worked for years after his diagnosis and onset of his syncope and collapse symptoms. King first visited Dr. Raizner for his symptoms in December 2016. (Record at 645–57, 995–96). He saw Dr. Nasir the same month and received results for a head-up tilt-table test, which returned positive for vasovagal syncope. (*Id.* at 640–41). Yet King worked for Valero until May 8, 2023, (*id.* at 77), and, on his Claimant Statement, anticipated returning to work on October 13, 2023, (*id.* at 130). King's significant post-diagnosis work regimen undercuts the claim that his illness prevents him from performing his job's material and substantial duties.

Second, King did not approach his illness and symptoms as if they were so debilitating that he could not work. King's medical file is relatively sparse in comparison to the seriousness of the disability he claims. The parties do not point to any medical visits between 2016 and 2023. King visited Dr. Raizner in 2023, *after* he submitted his claims for disability to Valero and just *before* he submitted his claim to Unum. Dr. Raizner's notes from King's visits repeatedly refer to his instruction to King to go to the emergency room if he experienced worsening symptoms. (*See, e.g.*, *id.* at 309). Yet King did not visit the emergency room despite testifying to symptoms and debilitating effects that would almost certainly call for such visits, such as repeated and daily

syncope episodes. (*See id.* at 2179). Nor did he go to the neurologist referred by Dr. Raizner, or to another neurologist. (*Id.* at 2274). In 2023, King reported to Smith that he was walking 20 minutes a day, weightlifting, using a stationary bike three times per week, and helping with household chores and cooking. (*Id.* at 381). But in 2024, after his appeal, he reported that he could not walk for more than 30 minutes, was unable to stand 10 to 15 minutes at a time without resting, and is unable to drive. (*Id.* at 1097–99). The inconsistent statements and allegedly rapid physical decline coincide substantially with the progress of his claim and lack documented medical evidence to support his statements.

Third, Ulum's medical professionals described ample bases for their conclusion. (*See id.* at 569, 572, 2179). Dr. Driscoll noted the lack of urgent care or emergency room evaluations related to a syncopal event, King's otherwise normal physical exam findings, and the overall low level of attention King displayed toward his illness. (*Id.* at 568–69). Dr. DiDonna highlighted that King had not experienced a documented (as opposed to reported) syncopal event since his alleged date of disability and the absence of any signs of structural heart disease and concluded, based on the absence of severe incidents, that King's symptoms were manageable with medication. (*Id.* at 572). Dr. DiDonna's comments are consistent with Dr. Raizner's recommendation that King see a neurologist, who might be able to find a separate cause for the symptoms King reported. Dr. Bright summarized the available medical information, including the previous medical reviews, in light of the information that King provided on appeal. Dr. Bright explained that King's reported symptoms were inconsistent with the medical tests and his other statements in the medical file. (*Id.* at 2177–79). In her view, King's circulatory issues were appropriately managed with medication. (*Id.* at 2179). All three professionals concluded that the medical evidence did not support the work restrictions and limitations King claimed. (*Id.* at 569, 572, 2179).

The evidence favorable to King does not refute these medical opinions or provide contrary facts that outweigh the evidence against him.  The reports from King, his family, and friends do describe severe symptoms, but they are all self-reported.  They do not gain more credibility because Dr. Raizner included King's reported symptoms in his files and notes, which were often made after telemedicine visits without physical examinations.  (*Id.* at 616–19, 2248–50).  Otherwise, King's files report his hypertension as benign and do not reveal underlying circulatory issues that would lead to debilitating syncope.  (*Id.* at 309, 467, 462, 2249; *cf. id.* at 2274 (referring King for a neurologist)).  Dr. Raizner's explanations of King's restrictions and limitations are sparse: he ignored Dr. Driscoll's request for information about King's medical limitations after she submitted a preliminary analysis of his file, and Dr. Raizner's post-denial restrictions-and-limitations form offers little explanation for his assessment of King's limited mobility or ability to work.  (*Id.* at 549–50, 2270–71).  King did not request an independent medical examination to corroborate his self-reported symptoms.  (*Id.* at 273).  Although he was hospitalized twice and went to the emergency room three times in 2016 due to his symptoms, he continued to work at Valero for more than six years afterwards, and he has had no hospitalizations or emergency room visits since he stopped working.

Unum Life's medical professionals considered all this information and concluded that the medical evidence did not support King's restrictions and limitations.  Their conclusion is supported by the record.  *Cf. Spenrath v. Guardian Life Ins. Co. of Am.*, 564 Fed. App'x. 93, 98 (5th Cir. 2014) (per curiam) (affirming the district court's judgment in favor of the insurer and noting that the insurer "did not fail to credit the evidence [the claimant] provided; instead, it concluded that that evidence was not sufficient").

**IV.    Conclusion**

For these reasons, the court grants Unum's motion for summary judgment, (Docket Entry No. 19), and denies King's motion for summary judgment, (Docket Entry No. 23).  A final judgment in Unum's favor is entered separately.

SIGNED on May 28, 2026, at Houston, Texas.

_____
Lee H. Rosenthal
Senior United States District Judge